# Federal Defenders
## O F   N E W   Y O R K ,   I N C .

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

June 9, 2017

***E-Filed Submission Dated 6/9/17***
The Honorable Allyne R. Ross
Senior United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

　　　　RE:　　**U.S.A. v. Amaury Rosario**, 99 CR 533, 12 CV 3432 (ARR)

Your Honor:

　　　　Every once and awhile in the criminal law, you run across a case that makes you rethink everything you have learned.  This may be that case.

　　　　The defendant has been granted a resentencing, pursuant to *Miller v. Alabama*, 132 S.Ct 2455 (2012), and *Montgomery v. Louisiana*, 136 S. Ct 718 (2016).  My client, Amaury Rosario was convicted on June 29, 2001 of one count of conspiracy to commit robbery and attempted robbery in violation of 18 U.S.C. § 1951 (the "Hobbs Act"), use of a firearm in relation to crimes of violence in violation of 18 U.S.C. § 924(c)(1), and four counts of murder through use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(j)(1).  He shot five people, killing four, during a botched robbery in 1995.  He had been handed an Uzi-type submachine gun by an older co-defendant and was essentially ordered to shoot.  He was 17 years old.  On its face his crime easily qualifies for life imprisonment.  It qualifies for the death penalty in 32 states.  This Court has been given the opportunity by Supreme Court precedent to revisit the sentence, 22 years later.

　　　　Your Honor has lived with this case since 1998, and it has been on the docket for resentencing since at least 2014.  But for those of us coming in later, it has been a process.  By now courts have developed a body of experience with *Miller* resentencings.  Your Honor undoubtedly knows that about the resentencings that have gone before in this District, including three defendants convicted of murders related to their Green Dragons gang activity, 90 CR 1019.  Those defendants received sentences of 37 years (US v. Kwok, 90 CR 1019 (SJ)), 35 years (US

1

v. Wong, 90 CR 1019 (RJD)), and 30 years (US v. Wang, (DLI)).  It is now familiar territory that the *Miller* and *Montgomery* precedents permit life without parole for juvenile homicides in only a small subset of cases, and that the "occasions for sentencing juveniles to the harshest possible penalty will be uncommon." *Miller*, at 2469.  Citing the "evolving standards of decency that mark the progress of a maturing society," *Roper v Simmons*, 543 U.S 551 (2005), the Supreme Court has ordained that life without parole is reserved for the worst of the worst – those rare juveniles whose crimes show "irreparable corruption," and whose prospects of reform are so grim as to be examples of "permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734, 736.  This is so given the legal recognition that juveniles have "diminished culpability and greater prospects for reform," making them "less deserving of the most severe punishments." *Miller,* at 2464 (social science and hard science support what any parent knows – that there are fundamental differences between juvenile and adult minds).

Reminding us that the "[t]he Eighth Amendment is not fastened to the obsolete." *Miller,* at 2469 (*citing Hall v Florida*, 134 S.Ct. 1986 (2014)), the Supreme Court requires that attention be paid to modern neuroscience in understanding the complicated development of the adolescent and the young adult brain. The science is now widely accepted.[1]

By this submission we will attempt to personalize the science to the life of our client, Amaury Rosario.  We have tried to marshal the evidence from what remains of a record of three criminal trials arising out of the 1995 shootings at the *Compadre* robbery.  What emerges is the very human reality of Mr. Rosario's participation in a senseless crime driven by the hallmarks of youth: (1) chronological age and its features, including immaturity, impetuosity, and failure to appreciate risks and consequences; (2) susceptibility to familial and peer influences, (3) inability to extricate himself from horrific crime-producing situations.  We offer this submission with the sincere hope of providing information to demonstrate how Mr. Rosario's crime reflected transient immaturity, as opposed to "permanent incorrigibility or "irreparable corruption."   It seems so apparent, having now become so immersed in the record of this case, that Mr. Rosario's "transient immaturity" was paired with a crimogenic, gun-filled environment, with deadly results.

While the subject matter of this case is dark, there is some light.  Seeing the degree to which Mr. Rosario has rehabilitated himself over the 22 years he has spent in prison has inspired people.  We are pleased to be able to share that piece of his story, and also grateful for the opportunity to allow him to set the record straight and to be his own man.

The attachments are listed in the Exhibit Binder as follows:

---

[1]Exhibit J is a report by the leading authority on the subject, Dr. Laurence Steinberg, PhD. Dr. Steinberg was the lead scientific consultant for the American Psychological Association when the Association filed Amicus Curiae briefs in *Miller, Graham,* and *Roper,* and his remarks were filed in 90 CR 1019 in connection with another *Miller* resentencing before Chief Judge Irizarry in 90 CR 1019, and reprinted here. Dr Steinberg states: "My colleagues and I, along with other researchers, have conducted studies finding that approximately ninety percent of serious juvenile offenders age out of crime and do not
continue criminal behavior into adulthood.

*Attachments to Defense Submission, United States v. Amaury Rosario, 99 CR 533*

| Exhibit | Description |
|---|---|
| A | Letter to Court from Defendant Amaury Rosario |
| B | Social History of Defendant by Mitigation Expert Melanie Carr, 6.5.2017 |
| C | Forensic Psychiatric Evaluation of Defendant by Dr. Alexander Bardey, M.D., 6.5.2017 |
| D | Confidential Psychological Evaluation by Dr. Barry Rosenfeld, Ph.D., 10.12.1998; Psychological Evaluation by Dr. N.G. Berrill, 2.26.1999; Psychological Evaluation by Dr. Ife A. Landsmark, Ph.D., 4.16.1999 (Juvenile Transfer Proceeding, US v. Rosario) |
| E | Report by Laurence Steinberg, Ph.D., expert in adolescent brain development, submitted on docket in US v. Joseph Wang, 90-CR-1019, 1.30.2017 |
| F | Forensics Ballistics Report by Former NYPD Detective Bruno Valenti, 5.31.2017 |
| G | Confidential Memorandum re: Interviews of Bureau of Prisons Officers Lafferty and Zeller, USP Canaan, 5.25.2017; Confidential Memorandum re: Interviews of Bureau of Prisons Officers Kwesi Dunston, PhD., Challenge Treatment Coordinator, Joshua J. Vogel, B.S. Specialty Treatment Program Specialist, 5.15.2017 |
| H | Juvenile Criminal History Documents, Amaury Rosario |
| I | Transcript of Videotaped Confession by Amaury Rosario, 12.17.1995; Written Statement Police by Amaury Rosario, 12.17.1995; Written Statement by Police Sean Estrella, 12.18.1995 |
| J | Sentencing Transcript, US v. Amaury Rosario, 6.26.2001; Sentencing Transcript, People v. Almein Cain, 11.24.1997; Declaration of Anthony L. Ricco, Esq., 04-CV-688, 4.10.2005 |
| K | Summary Table of Bureau of Prisons Records and Associated Documents |
| L | Inmate-Led Program: Running Free, Created by Amaury Rosario; Inmate and Former Inmate Letters In Support |
| M | Letters of Support from Family and Friends |
| N | Plan for Reentry, Reintegration, and Community Support by Social Worker Vivianne Guevara, June 2017 |
| O | Admissions letter from Columbia Beyond the Bars Fellowship, 3.31.2017; Letter from Restorative Justice Practitioner Kay Pranis, 5.29.2017 |

# I. A N A L Y S I S

We begin, as we must, by acknowledging the gravity of the underlying crime. That painful subject cannot be avoided if one is to seriously confront the legally relevant questions: was Amaury Rosario's juvenile homicide borne of "irreparable corruption" or "permanent incorrigibility?" What he did is, of course, terrible. But let us begin from the proposition that murder is the *only* crime for which juvenile offenders may be sentenced to life. *Graham v. Florida*, 560 U.S. 48 (2010). As such, the Supreme Court has repeatedly reaffirmed that the heinousness of a crime is not sufficient to demonstrate that a juvenile offender is beyond redemption. *Roper v. Simmons*, 543 U.S. 551, 570 (2005).

## A. *MILLER* SENTENCING FACTORS

The factors under *Miller* and *Montgomery* compel us to start from the beginning, analyzing the defendant's unique background.

**1.** **_Miller_ Factors:** Upbringing/Environment/Character And Record of Defendant.

This defendant had some unique challenges growing up. Exhibit B (Carr Report); Exhibit C (Bardey Report); Exhibit D (Juvenile Transfer Evaluations). His parents did their best, but by any modern standards of corporal punishment he was abused at home, and his academic and social needs neglected. (This is not to blame otherwise well-meaning parents, but to put the *Miller* factors in perspective). There was a pattern of social isolation imposed on the Rosario children, in which the parents prevented them from social development outside of the family.[2] The defendant started kindergarten behind, failed first grade, and never recovered academically. Standardized tests showed he had little pre-schooling education – he could not, for example, tell more than 4 out of 10 colors, and he failed first grade.[3]  Struggling academically and socially throughout elementary school, he switched schools six times. His parents rejected institutional support or counseling that might have made a difference.

The defendant's larger environment was chaotic and violent. As he neared adolescence in the late 1980s and early 90s, New York City experienced an unprecedented crime wave. The Court will recall the many violent crime and gang trials of the 1990s (Green Dragons, Born to Kill, Latin Kings, to name just a few) in this District alone. It was a very different New York. Crime statistics

---

[2] Exhibit B (Carr Report), at 7, describes this pattern, which was also described in the 1999 juvenile transfer proceeding. *See also* Exhibit D, Landsmark Evaluation, at 6. The testifying co-defendant discussed it hiding in the defendant's closet because of this isolation during the defendant's trials. Rosario Federal Trial, 12/14/99, at 237 (Sean Estrella testimony that he had to hide in the closet if he went to Amaury Rosario's house because his parents would not let friends over); State Trial Amaury Rosario, 2/10/98, at 180-81.

[3] Exhibit B, at 6. He scored a "zero" for Expressive Language, *id.*, which makes the self-taught writing skills he developed while in prison that much more remarkable.

showing what was "normal" then is unimaginable today.

A check of the statistical reporting body of the NYPD, COMPSTAT, allows you to sort by crime and year:

- ♦ If you compare the year 1993 with the year 2016 for serious crimes (murder, rape, robbery, felony assault, etc), , you see that rates dropped **76.8%.**
- ♦ If you compare the year 1993 with the year 2016 for murder alone, you see the murder rate dropped **82.9%.**
- ♦ Gun violence peaked in the mid-1990s ( Department of Justice Statistics, Crimes Committed with Firearms 1975-2003.)



The defendant's life experience reflected the reality of these statistics in the most crime-ridden areas.  He was exposed to crime from an early age on the streets and in his father's stores, where he worked.  Exhibit B (Carr Report).   The exposure to his father's bodega businesses also acculturated him to the blurred lines between players and non-players in the criminal game, surely priming him for the sense as an adolescent that everyone was "in the game."  Exhibit C (Bardey Report).[4]

Even school was violent.  The defendant attended 9th Grade at one of the lowest performing and most violent in the city.[5] In the 1992-93 school year alone the school had 26 violent crimes on

---

[4]  Eric Caraballo testified that the *Compadre* was the only store in the neighborhood that had not been robbed at thee time.  Rosario State Trial, 2/23/98, at 386.

[5]  Exhibit C (Carr Report, at 1) *(State Education Department eyes closure of Newtown High School,*Daily News New York, July 28, 2010; http://www.nydailynews.com/new-york/queens/state-education-department-eyes-closure-newtown-high-school-articl

its campus.[6]  The defendant started bringing knives and brass-knuckles to school to defend himself. Exhibit C (Bardey Report, at 5).   When he was excessively absent in 9th grade, a "truant officer" checked on him.  Exhibit B (Carr Report, at 5).  Once.  This is not to criticize the schools, but to point out how institutional systems designed in theory to prevent juvenile delinquency failed in practice here.



**Picture from Huffington Post "Photos of 90s New York."**

Criminal influences in the local park picked up where school left off.  The defendant and others were schooled in smalltime gang shenanigans.  So well studied is the allure of street gangs and older criminal influences that it scarcely requires source citation.[7]  Teenagers are easily influenced by negative role models in general, but for most kids unexposed to toxic high crime  influences, the role models are relatively harmless.  Not so for this defendant.  In his own family a gang-affiliated cousin and uncle encouraged infatuation with the criminal lifestyle.  Exhibit B, Carr Report, 14-15; Exhibit C, Bardey Report 25.   He experienced first hand the power of guns and street credibility.   What a revelation it must have been for him to see his gangster uncle stand up to his frightening father.  Exhibit B (Carr Report,  at 15).

Then there was his risk-taking.  A typical devil-may-care adolescent might have a high threshhhold for risk-taking, e.g. he might skateboard without a helmet.  Mr. Rosario's personality, environment and influences compounded that inherent risk to an extraordinary degree.  Instead of not wearing a helmet, his feats of daring were jumping on and "surfing" the back of city buses.  Or playing subway dares games with his friends, meaning they would ride on the outside of a moving train and dare each other to jump onto the platform without hitting the concrete pillars.  Mr. Rosario started out harmlessly enough as a graffiti artist, tagging buildings with paint, even keeping black books collecting other artists' tags.  But even as a grafitti artist he was described as a daredevil – hanging off ledges to find the "heart-thumping" challenges.  Exhibit B, (Carr Report, at 11).

One can easily see how the environmental factors the defendant faced at home, in his

---

e-1.196284.

[6]Assaults/robberies/weapon During the 1992-93 school year, officials at Newtown "reported to the Board of Education a total of 26 serious incidents, including assaults, robberies, weapon confiscations and other disturbances." *Queens Sophomore Slashed by 2 Youths for Gold Chain*, New York Times, 1994.

[7]  In New York City of the 1990s, the police saw it as a new twist on an old story as the new ethnic immigrant crime groups began "following the path of ethnic crime groups of the past who preyed on their own before branching out into other areas once they gained wealth and power.  It's our impression that this is happening in New York."  NYT, 4/1/92 (www.nytimes.com/1992/04/01/nyregion/asian-street-gangs-emerging-as-new-underworld.html (quoting Lieut. Joseph Pollini of New York City Police Department's major crime unit).

neighborhood, and in his school, compounded the daredevil nature of this young man in a profound, and ultimately, deadly way.  Drugs and alcohol played some role here, to be sure. While we make no claim that substances excuse the crime, it is worth knowing that Mr. Rosario used drugs, and likely PCP, the night of the crime to "get courage." Exhibit C, Bardey Report, at 6.



The 5Pointz building in Queens was considered a landmark to graffiti artists.

    The false courage of drugs does help explain what pushed him so deep into danger that night. From what else can we glean a violent nature in him?  Bearing in mind that his juvenile record was sealed, there was some information available from the record, including some criminal complaints from juvenile cases.  It would be unfair to assume the truth of the complaints, and yet even if you do, the complaints describe nothing more than a textbook record of older, bad influence on  impulsive juvenile delinquency, which placed him in the hub of bad influence, now closed Spofford Juvenile Facility.  Exhibit H (Criminal complaints).[8]   A 12/15/93 arrest describes how one Mathew Larkin, an adult, asked a complainant to enter his house, and then sent two teenage boys inside (including 16 year old Amaury Rosario) to take a radio and $50 (it is unclear whether the complainant was an adult or a teen).   A 3/2/94 arrest resulted in a disorderly conduct disposition but the complaint describes a standard drug sale where defendant "did hand a sum of [currency] to defendant . . . and defendant did then hand said sum of currency to an apprehended other . . . and the unapprehended other did then hand a quantity of



marijuana to defendant."  A 1/3/95 arrest describes how four perpetrators, at least two of them teens like the defendant, surrounded another teen.  A police officer observed one defendant point his finger "in a menacing manner," another defendant yank the victim's jacket sleeve, while a third demanded his watch. When the police called out the boys all ran.  A 3/8/95 complaint states that two teens approached a third teen and demanded his gold chain.  While a 17 year old Amaury Rosario grabbed the chain, the other teen took a Walkman Radio.

Picture from March 26, 2015 New York Post.  "More than a dozen people have lost their lives subway surfing – which was a popular stunt among local daredevils in the 1980s and also riding atop cars, accessed at www.nypost.com/2015/03/26/subway-surfers-again-spotted-in-ny

    There is arguably one violent crime discussed in the juvenile record.  That was discussed in connection with the proceedings before Your Honor in 1999. That was a 5/11/95 arrest.  Exhibit H, Juvenile Records.  The case resulted in a disorderly conduct youthful offender disposition.  The police said that 17 year old Amaury Rosario flailed and fought back during a marijuana arrest and

---

    [8] The Government was unable to locate the file boxes in this case.  We have limited records.

he used a metal railing against them.  The scuffle resulted in injuries to the defendant who was taken to Elmhurst Hospital where he was treated for a head laceration.  In this arguably violent altercation[9] the records from Elmhurst Hospital describe a "scuffle with the police" and say: "Slurred speech noted.  PT also mention he was getting high on dope."  Exhibit H (Record from Elmhurst Hospital, 5/11/95 3:52p).

**2.** *Miller* **Factors:** The Circumstances of the Offense, Susceptibility to Influence, and Psychological State

The crime was committed at the *Compadre* grocery in Queens.  It was 1995.  Amaury Rosario and his friend Sean Estrella were teenage boys ditching school and hanging out with their girlfriends.  The girlfriends were sisters, whose mother was dating an older ex-convict.  For a short time the boys lived with their girlfriends, their mother and the convict boyfriend in a house in Queens.  The convict boyfriend, Julio Posada (27), introduced the boys to Almein Cain (25), an ex-convict.  Exhibit B, Carr Report, at 17.  The two older men planned the robbery, claiming the bodega would have a large sum of money that night.[10]  The older men were on parole for armed robbery, so they had some experience in this area.  Exhibit B (Carr Report, at 17).[11]

Mr. Rosario remembered that he had "initially felt excited to be associated with" one of the robbers, Almein Cain (named Biblically enough), who was "well known and was held in high regard for robberies he committed."  Exhibit C (Bardey Report, at 5).  Cain showed off his cache of weapons to the boys and bragged about his exploits.  Sean Estrella testified as much in three trials (Mr. Rosario's Federal and state trials, Cain's state trial).  The actual planning of the robbery was minimal.  It took place in the getaway van on the way to the *Compadre*.  There were guns that Cain brought in a bookbag, but these were for intimidation.  No one discussed shooting anyone.  During

---

[9] It is also worth considering how this type of altercation between police and young boys and men can sometimes suggest less about violence than about the generalized distrust and of resentment of police, especially among Black and Latino boys of the time.  This concept finds ample support in the academic literature.  James Diego Vigil, a professor of social ecology at UC Irvine, writes: "Overall, ethnic minority youths, gang or non-gang, resent the 'dissing' (disrespect) meted out by patrol officers . . . Once youths have begun to reject the law and its underlying values, they often develop a resistance orientation and take defiant and destructive stance."  James Diego Vigil, *A Rainbow of Gangs: Street Cultures in the Mega-City*, 2002, University of Texas Press (Austin).

[10] See, e.g., Federal Trial, 12/13/99, Tr. 124-25; *see also* People v. Cain, 9/17/97, Tr. 138.  The likelihood that there could be money from illegal activities in a bodega made sense to the defendant given his experience in his father's bodegas.  Surviving witness Eric Caraballo testified that in the store was in fact taking in about $4000 a month in illegal gambling proceeds and "a couple thousand" a week selling Dominican numbers.  Federal Trial, 12/14/99, at 297-98.

[11] Posada had been released from prison for Robbery and Attempted Robbery in the 1st Degree.  Cain's record shows unauthorized use of a vehicle, and an armed robbery in Manhattan for which he was on two years' parole at the time.  (State trial record and NY DOC Inmate Information, last accessed 8/30/2016).

the getaway car planning session, the older robbers gave the boys discrete tasks.[12]  Sean Estrella's task was to look for the safes.[13]  The defendant's task was to "hide in the basement so that after closing hours [he] could open the store back up.[14] This worked – it was consistent both with his adolescent preference for risky, daredevil stunts.  It was also a logical job for him for reasons discussed in his 1995 videotaped statement:

> Q: [by Assistant District Attorney]: You grew up in this neighborhood, so you're familiar with the store?
> A :[by Amaury Rosario]: [nods]
> Q: You know everyone who works in there?
> A: [nods]
> Q: And everyone knows you?
> A: [nods]
> Q: And that's why Bubba [Cain] asked you to go in first, because they knew you?
> A: [nods].[15]

So, into the bodega Cain sent the defendant with a gun, described in court as a TEC-9. Cain's instructions:  hide in the basement, wait for closing, subdue anyone who remained in the store, and let the other robbers in.[16]

From Mr. Rosario's 1995 confession we learn what happened next.  Mr. Rosario did get into the basement, but instead of subduing the occupants he interacted with them.  Among the many strange ironies of this unusual case is a series of exchanges between Mr. Rosario and the victims. The first was with Ramon Rodriguez, a gentleman whom the neighborhood kids referred to as "the

---

[12]  In opening statements the prosecutor previewed the evidence that "Julio Posada was the person who brought the defendant (Amaury Rosario) and Sean Estrella into the crew.  Julio Posada knew the defendant and knew Sean Estrella because the woman Julio Posada is dating is the mother of Sean Estrella's wife and defendant's girlfriend.  The two sisters, their mother, was Julio Posada's girlfriend."  Federal Trial 12/13/99, at 16.  Estrella testified that "Cain and Julio [Posada] started discussing a robbery . . . that there was a bodega they were planning to stick up."  Federal Trial, 12/13/99, at 119.

[13]  Federal Trial, 12/13/99, at 120-121.

[14]  Federal Trial, 12/13/99, at 120-121.

[15]  Amaury Rosario, Transcript of Videotaped Statement, December 17, 1995.  That Rosario knew these victims from "hanging out" with the kids in front of the store was the subject of testimony from both Eric Caraballo and Sean Estrella.  Rosario State Trial (Caraballo, 2/23/98, at 345);  Federal Trial (Estrella), 12/13/99, at 120.

[16]  Federal Trial, 12/14/99, at 132-143.

old man." There were no other witnesses to this pre-shooting basement exchange with victim Rodriguez:[17]

> Q [by Assistant District Attorney]: Where did he see you?  When you first walked in, or he saw you downstairs?
> A: [by Amaury Rosario]:  When I went downstairs.  Cause he was sleeping.
> Q: Who was sleeping?
> A: Ramon.
> A: Ramon was.
> Q: And he look over, he told me what I was doing there. . . And he just told me – he just told me to go relax in the back.  And then when Eric leaves, he will let me go upstairs and he will let me drink something and leave.
>                        *                        *                        *
> Q: Did he give you anything to eat?
> A: (shakes head) I was drinking something.  I was drinking and he – I think he took a sip.  Cause I was kind, already a little buzzed.
> Q: He gave you something to drink?
> A: He was drinking, something downstairs.
> Q: He was drinking,?
> A: [nods]
> Q: And he let you have some?
> A: And he told me not to get him in trouble.[18]

After their exchange, victim Ramon Rodriguez left the defendant behind in the basement.

Mr. Rosario describes the moment:

> When I was in the basement after Ramon Rodriguez was gone I am like what am I doing?  The old man had treated me decent like, you know.  What if they have guns?  We gonna all get killed.  This is crazy.  I wanted to back out.  That's when I hear Eric coming down, checking the lights.  All I wanted to do was get rid of that gun.  I was all over the basement trying to find a place to hide it.  I climbed.  I found a spot.  I

---

[17]  "The expression of empathy in his statements, particularly his way of discussing his interactions with the victims, is entirely inconsistent with an antisocial mindset, which would be to depersonalize and blame victims." Exhibit C (Bardey Report, at 23).  It is the same empathy that struck the of Psychology and Treatment Specialist at USPC Canaan who observed the older Mr. Rosario over a period of many years in the Federal prison.  His sincere expressions of emotion and empathy set him apart: "[Rosario] was one of the few inmates confident and sincere enough to share openly about his remorse such that he would cry at appropriate times in intense discussions. His ability to show enough vulnerability to cry, particularly in front of other inmates, is significant in general, but in the setting of a maximum-security prison, where expressions of weakness can be dangerous, it is remarkable."

[18]  Videotaped Statement of Amaury Rosario, dated December 17, 1995, at 17.

*wanted it out of sight.  I wanted it so no one could use it.  Eric was coming.  I dropped down and pretended to be asleep.[19]*

Mr. Rosario was trying to back out.  Had he wanted to proceed with the plan, subdue Eric Caraballo as he was coming down the stairs to the basement, there was time.  A significant amount of time.  That can be seen from the testimony by Mr. Caraballo about how long it took him to get down into the basement that night, while the panicked 17 year old was trying to get rid of the gun:

*Q. [Prosecutor]: And on the night of November l4 can you tell the jury what happened when you walked downstairs?*
*A. [Mr. Caraballo]:  When I went downstairs to check it out, I went downstairs to the left side where the boiler room is because you can see, from the bottom of the basement you can see to both sides. I decide to go to the boiler room area and when I went to, turn out the light the light wasn't on*
*Q. So, what did you do, after you went down there to turn the light on and it don't didn't come an, what did you do next?*
*A. I figure probably the light bulb wasn't good so I went to check it out and it was missing so that I decide to go upstairs and replace --*
*Q. What did you do when you got back upstairs?*
*A. I went upstairs and ask Ramon that way I could go downstairs and fix it.*
*Q. Did Ramon respond to you?*
*A. Yeah, he asked me how many watts, I said whatever because to put it down there it doesn't matter. how many watts...*

---

[19]  Eric Caraballo testified that on September 23, 1997, nearly 2 years after the robbery, he found the TEC-9 hidden in the basement where the defendant had left it.   Federal Trial, 12/14/99, at 332-34; Amaury Rosario State Trial, at 393.  The detective who vouchered the gun testified about how well hidden it was in a hard-to-reach spot. Rosario State Trial, 2/24/98, at 481-82 (testimony of Det. Fieldsa):

*A:  There is, I guess, a storage or freezer room and between the roof of the basement and the top of that room there's about a foot and a half. The weapon was secreted up there under a .. piece of cardboard.*
*Q And can you describe, you indicated that there was a wall that did not go all the way up to the ceiling?*
*A That's correct.*
*Q How many of - - how much clearance was it from the end of the wall and ceiling itself?*
*A  I would say about a foot and a half.*
*Q What did you use to gain access?*
*A  I had to stand on, there are some crates, milk crates and boxes below that. I moved it into position and stood up on there so I could look over the roof.*
*Q When were you able to do that? And you stood up and look over the roof you observe a weapon?*
*A Yes, I did.*

11

*Q. So, did you go back downstairs to the basement?*
*A. Yes, I did.*
*Q. What happened when you got back downstairs?*
*A. Well, I replaced the light bulb, I saw it was missing so I put another one. Then when I turned out the light, here was another part that was dark because the office was -- it is like a small room in the front of the office. I turned that one. Then I went to check to the other side where the boiler room is. I went to turn out the light and the other light bulb also was missing.*
*Q. And you said near the office, did you put in a light bulb near there?*
*A. Yeah.*
*Q. Did that light come on?*
*A. Yes.*
*Q. And so what happened after you turned that light on?*
*A:. I decide to go all the way to the top to the boiler, near to the boiler in the top we used to have another light bulb, to turn that on. That's when I found somebody down there laying in the boiler room.*[20]

From the Mr. Rosario's 1995 written statement to police, we have a description – which eerily dovetails with Eric Caraballo's testimony[21] – of another important exchange between the defendant and Eric Caraballo:

> *Eric came down . . . and I said 'Yo soy loco' and I took my hat off so he could see me and Eric told me to go upstairs and leave.  As I headed for the stairs to go up I was met by "Trickie" [victim Raul Acosta] who put his arm around me and we walk up the stairs.  Trickie stated to me Amaur your always welcome but next time ask.*

Exhibit E, Amaury Rosario, Written Statement, December 17, 1999.  As Your Honor already knows where all of this leads, allow me to digress from the chronology for some analysis here. This "yo soy loco" conversation with Eric Caraballo, along with the "you are always welcome" conversation with another victim, Raul Acosta ("Trickie"), are striking to me for two reasons. First, the statement all by itself should establish that Mr. Rosario lacked the character necessary for a finding of incorrigibility.  "The expression of empathy in his statements, particularly his way of discussing his interactions with the victims, is entirely inconsistent with an antisocial mindset, which would be to depersonalize and blame victims."  Exhibit C (Bardey Report, 23).  Secondly, the "yo soy loco" conversation is important as evidence of

---

[20] Federal Trial, 12/14/99, at 308-310.

[21] Amaury Rosario State Trial Transcript, 2/23/98, at 342-43 (Q:[Prosecutor] What happened at that time [after you discovered someone laying on the floor]? A:[Eric Caraballo] I asked who's there?  He said it's me, loco. Q: What language did he say it in? A: In Spanish...that expression is used when you know or knew somebody that make you closer to somebody.  Like it's me, loco how are you doing?  Hi, how are you doing?)

defendant's intent to withdraw from the crime at that point.  In the time it took Mr. Caraballo to discover the defendant, the defendant was looking for ways to sabotage the crime, not to "subdue" him as Cain had directed.  Rather than find tactical advantage, he chose to walk up the stairs, in front of the vulnerable Mr. Caraballo, and leave the store.[22]

What happened after the defendant attempted to sabotage the plan was not anticipated by anyone.  Sean Estrella testified to Cain's response to the defendant when he returned to the getaway van without Cain's TEC-9 is in Sean Estrella's testimony:

> Q: What did the defendant tell you had happened while he was inside the store?
> A: That he had entered the basement and hid behind a furnace or something, a boiler. I'm not too sure what it was.  As he hid down there somebody within the store had found him. . . He left the gun down there hidden behind the furnace and he explained to the man that found him, he told him that he had drank a little that night and he had fallen asleep in the basement.
> Q: What, if anything, was the response when the defendant said he had left the gun inside the basement?
> *                    *                    *
> A: Cain was upset that he had left the gun. . . He asked why did he leave the gun, why didn't he go ahead with what was planned if they had found him.
> Q: Did the defendant say anything in response to that?
> A: He didn't know how many people were upstairs.  He wasn't sure how many people were in the store, whether it was closed or not.
> Q: What tone of voice was Almein Cain using when he was discussing the gun being left in the basement?
> A: He sounded upset.[23]

In his December 1995 statement, we hear Mr. Rosario describing classic indicia of duress in a conversation corroborated by Estrella's testimony (above):

> I *walked over to the van and 'Bubba' [Cain] stated to me 'what the fuck you doing get back in the store' and I said there's to [sic] many people in there.  I then look down the block at the bodega and Marvin [victim Marvin Caraballo] pulled up in his van and parked in front of the bodega.  I said to Bubba look there's another person, there is too many people in there.  He then told me to do what was planned*

---

[22]  Amaury Rosario State Trial Transcript, 2/23/98, at 345.

[23]  Federal Trial, 12/14/99, at 144-145; Federal Trial, Tr. 2/10/98, at 168.  In the Police Report of Sean Estrella's written statement 12/18/95, Estrella states that when Rosario came back to the van he told Cain there were "4 or 5 people" in the bodega, which Rosario would have been lying to Cain about, further supporting the idea that he was trying to sabotage Cain's plan.  The objective evidence showing there were 2 or possibly 3 people in the store at that time Rosario left the basement.

*and to get back into the store or they will take me down there.  I walked back to the
store and knocked on the door.[24]*

What happens next is human tragedy on every possible level.  After Cain ordered the
defendant to go back to the store, knock on the door and say he left his jacket in the basement.[25] As
soon as the door was unlocked, the others were going to rush in.[26]  Cain had the Uzi-type
submachine gun and Posada had the .32 revolver.  Mr. Rosario was still unarmed – despite getting
back into the store he never did retrieve the TEC-9 from the basement.   It was found over a year
later in the hiding place he left it.  The record is unequivocal that Mr. Rosario was unarmed during
the robbery until the moment Cain put the Uzi in his hand.[27]

Not only was he unarmed but he had no role in the herding of victims to the back of the
store where they were forced to lay down in a narrow corridor by Cain and Posada – both armed.
Mr. Caraballo did not even see Mr. Rosario after the basement exchange.[28]  Mr. Caraballo *did* see
Cain, whom he identified as the masked man who was "carrying a machine gun" and "announced a
holdup" and ordered Mr. Caraballo to hang up the phone.  Mr. Caraballo then saw a second robber
coming in with a gun (describing Posada), who had victim Giuseppe Meluzio in a choke hold and

---

[24] Exhibit I, Amaury Rosario Written Statement dated 12/17/1995, part of court record. The account in this 1995 statement of seeing Marvin pull up and go into the store is also consistent with Mr. Caraballo's testimony that his brother Marvin was not in the store when Mr. Rosario was escorted out, but came in between that time and the robbery.  Amaury Rosario State Trial, 2/23/98, at 351-353.

[25] In the Government's closing in the Federal trial he said the evidence about how the crew handled this moment could be compared to a football game, where quarterback (Cain) changes the play by calling a audible for a new play.  "When you do that, you take a risk, because you are setting up a plan on a moment's notice and you are not thinking things thorugh and it has the potential to blow up in your face.  Almein Cain called out a new play. He said, this is the way we are going to get back in.  He tells the defendant, you are going to go, knock on the door, tell them you left your jacket in there.  That's the way we are going to get the door open." Federal Trial, 12/21/99, at 870.

[26] There is conflict in the record about how long the defendant was in the store before the others pushed in. Mr. Rosario remembers, and both he and Estrella's 1995 statements say, that he was inside for a few minutes and that it was when victim Rodriguez opened the door to let him out that the others pushed in.  (Amaury Rosario Statement, dated December 17, 1995; Sean Estrella statement, dated December 18, 1995 (defendant was inside 1 to 2 minutes)).  At the Federal trial, Estrella testified they pushed in right behind Rosario going in.  At the state trial he testified consistent with his December 1995 statement that they pushed their way in "two minutes later when [Rosario] was coming back out" and that Rosario never got outside of the store.   Amaury Rosario State Trial, 2/9/98, at 80.

[27] Rosario Federal Trial, 12/14/99, at 150;  Rosario State Trial, 2/9/98, at 69-70.

[28] Mr. Caraballo testified to two robbers who were armed and pushing the victims to the back of the store. He had identified Amaury Rosario, but only as the person hiding in the basement earlier in the night.  "I gave the description of the guy that was downstairs (Rosario) in the basement, the one that was carrying the Uzi at the time (Cain) and the one that was preparing to go inside (Posada).  Those are the three persons I saw."  Federal Trial, 12/14/99, at 327; Amaury Rosario State Trial, 2/9/98, at 357-58.

14

was dragging him in from outside.[29]   The last thing Mr. Caraballo could say he saw was Cain and Posada – not Rosario – pushing victims to the back of the store and the "guy that was carrying Uzi (Cain)" and told them to lie face down.[30]

The details of the shooting were in Sean Estrella's testimony.  Estrella places Posada (with the .32) at the back of store with the victims while he observed the following exchange between Cain and the defendant:[31]

> *Q: What was said, if you could hear?*
> *A: That something had to be done.*
> *Q: Who said that?*
> *A: Cain.[32]*

At the Federal trial, Estrella said some more about that conversation:

> *Q. As best you can recall, what did they say to each other?*
> *A. Well, Rosario was worried about the victims seeing his face.*
> *Q. What did he say, as best you can recall?*
> *A. I remember Cain asking me what did he want to do about these people seeing his face, is there anything he felt he should do about it.*
> *Q. Did the defendant say anything in response?*
> *A. He really wasn't sure. He looked kind of like undecided. He wasn't sure what to do.*
> *Q. What happened next?*
> *A. Cain had cocked the Uzi and placed it in Rosario's hands and told him to do what he had to do.[33]*

Cain then walked defendant to the back.[34]   The shooting itself was described as if from an "automatic weapon" or "quick, rapid fire."[35]  Mr. Rosario pulled the trigger of the Uzi.  "In my

---

[29] Federal Trial, 12/14/1999, at 149.

[30] Federal Trial, 12/14/1999, at 318-321.

[31]  Federal Trial, 12/14/99, at 150; Amaury Rosario State Trial, 2/9/98, at 72.

[32]  Amaury Rosario State Trial, 2/9/98, at 73.

[33] Federal Trial, 12/14/99, at 152.

[34] Amaury Rosario State Trial, 2/9/98, at 74.

[35] Federal Trial, 12/14/99, at 322 (Caraballo); Federal Trial, 12/14/99, at 152 (Estrella)

mind then it was either shoot or be shot.  I shot."  Exhibit A (Defendant's Letter, at 1).[36]  There was at least one other shooter.  Ballistics evidence shows bullets from both an Uzi-type submachine gun and a .32 caliber revolver.  Autopsy results show at least one and possibly two victims were hit with the .32 caliber bullets.[37]

Meanwhile, back at the van Cain blamed the defendant for the failure of the operation.  Sean Estrella testified that the getaway driver Louie asked Mr. Rosario why he shot the gun.[38]  It is relevant that neither Cain nor Posada asked.  They of course knew why he shot.  Sean Estrella testified Mr. Rosario was "scared and nervous and he said because they seen my face."[39]  That may well be what he said in that tension-filled moment in the getaway van after the shooting, but it cannot begin to describe the gruesome situation he was in.  It makes little sense for the him to be asking that question in that moment.  It is true that the victims saw him – but he knew they saw him when he entered the basement unmasked.  He interacted with them.  Additionally, he knew they saw him when he returned to the store, on the ruse of getting his jacket.  What other reason would there be for being suddenly concerned about being seen by the victim unless it was expression of surprise at the unexpectedly brutality of Cain and Posada's actions.[40]

Estrella testified that after the robbery he and Cain stayed to together, while Rosario was dropped off.[41]  Cain later told the boys that if they talk they could they could "expect[] to be killed and my family and the same for anybody else."  Exhibit I, at 8 (Amaury Rosario, 12/17/95 Videotape Confession Transcript).

**3.**     ***Miller* Factors:** Nature and Circumstances Of Offense/Police Investigation and Statements/Character Traits Inconsistent with Irretrievable Depravity.

The next series of events involves how the defendant came to be a suspect in the robbery, and his response to police interrogation.  This part of the record is replete with features of adolescence.

---

[36]  Estrella testified that when it was over they all ended up back at the getaway van.  He described the defendant as "scared and nervous" after the shooting.  Almein Cain State Trial, 9/17/97, at 155.

[37]  Exhibit F  (Former NYPD Detective and Laboratory Analyst Valenti agrees with the ballistic evidence offered at trial and testimony of NYPD Det. Kevin Barry (Federal trial testimony 12/16/99) and Det. Joseph Amato (state trial testimony 12/16/99).

[38]  Amaury Rosario State Trial, 2/9/98, at 86-87.

[39]  State trial of Almein Cain, 9/17/97, at 155.

[40]  Evidence at trial showed the victims had lacerations consistent with having been "roughed up" – something was *not* done by Rosario.  Rosario's question to Cain about having been seen was further evidence of the chaotic and the inherent coercion of the crime.

[41]  Federal Trial, 12/14/99, at 158.

The statement began in what might be seen as either guilt or juvenile impulsivity, and lack of appreciation of risk, or all of the above. Not even a month after the crime, the defendant walked into the 110th precinct – the precinct investigating the high profile crime – accompanying his girlfriend on an unrelated matter.[42] She was in a dispute with another girl and he did not want her going alone. An officer recognized him as the person whom Mr. Caraballo had identified as being in the basement the night of the shooting and Mr. Rosario was asked to stay for questioning. He complied. The investigating detectives were called in from home and put Mr. Rosario in a room for questioning. Waiving Miranda, Mr. Rosario agreed to speak to them. They described him as at first as "nervous and fidgety," and he initially denied participating in the robbery.[43] The detectives built rapport. Det. Pia testified:

> *Q: Can you tell the Court the type of things you told Mr. Rosario at that point about the incident?*
> *A: Yes. I told him that – that, you know, we had done our homework prior to coming to the room, that I know you were involved in the incident, that it would be best to get it off your chest, and that I know you haven't slept since the day of the incident. . . There came a point in our conversation that I said to him, do you have any enemies out there. . . And he looked down. I said listen, you know, I said get it off your chest. I said, I know it has been bothering you. I said, maybe it wasn't planned to happen this way but it happened and that's the way it is. I said, and you know, you'd feel a lot better if you got it off your chest. And he looked down. He looked down for quite some time. I stopped talking. There was a pause. And he started to get emotional and he started crying. And a short time later, he looked up. He was in fact crying, and he started to admit his participation, stating that he was there, that he did participate and he went into detail of how it was planned and whatnot. During that time, once he stared to admit his involvement, I may have put my hand on his back, told him to relax, relax, I know, the worst is [sic] part is over. Now you are getting it out. Continue. And I just let him continue. I really didn't interrupt him too much during the verbal portion of his admission.[44]*

Detective Pia testified that the confession came just 25 minutes into the interrogation. Mr. Rosario explained his initial hesitation – with reference to his parents:

> Q: *Apart from telling – speaking with Mr. Rosario – about what you indicated to him you knew about the incident, did you cover any other topics in your conversation with him?*

---

[42] Jessica Gonzalez went to the precinct regarding a dispute she was having with other girls. Federal Suppression Hearing, 2/9/1999, Tr. 10-11, 27.

[43] Federal Suppression Hearing, 12/9/1999, at 12.

[44] Federal Suppression Hearing, 2/9/1999, Tr. 11-15.

*A: During our conversation, once he started to admit his involvement, after basically telling us what transpired and what participation he had in this, he said to me, or to myself and Detective Shevlin, that he would have told us sooner but the reason why he wasn't – he was withholding telling us was the fact that he was worried how either his mother or father would feel because one of the victims that were murdered was a relative of either his mother or father.[45]*

Det. Pia testified that during the oral statement Mr. Rosario appeared "sullen . . . his head was down during most of the time. He appeared – he appeared sad, but calmer than prior to his admission."[46] But "[o]nce that was done he pretty much — I'm not saying he was happy and jovial, but the tears subsided." [47]

The detectives tried to comfort him, told him it was good he "got it off his chest and asked if he wanted to make a statement."[48] Again exhibiting his lack of sophistication and juvenile mindset, he was willing to be guided on this important decision as well ("he looked and there was a pause and I said to him, you know, unless you want one of us to write it out.").[49] He let the detectives just write out a statement for him.

By the time the Assistant District Attorney took the videotaped confession (at least 14 hours after Detectives were first called to the 110th Precinct to question him), Mr. Rosario had been Mirandized three times, twice by Detectives and once by the Assistant District Attorney. He never requested to remain silent or to speak to any attorney. He reviewed photobooks with Detectives, and identified Cain.[50] It was his 110th precinct confession (including names, identifying information, and photo identification of Almein Cain) that provided the lead police needed to arrest Estrella, Cain, and Posada. Estrella, Cain, and Posada were arrested within hours. For his part, Estrella (then 18 years old) was told Mr. Rosario had implicated him[51] and Estrella then gave a detailed confession – except that when asked to identify Cain's photo,

---

[45] Federal Suppression Hearing, 2/9/1999, Tr. 15.

[46] Federal Suppression Hearing, 2/9/1999, Tr. 24.

[47] Federal Trial, 1999, Tr. 518-19.

[48] The videotaped statement was taken between 5:22p.m. and 5:50p.m. according to Government Exhibit 1A, Transcript, from Federal Trial. The detectives were first called to the precinct at 3:00 a.m. that day. Federal Suppression Hearing, 12/10/99, at 198.

[49] Federal Trial, 12/15/1999, Tr. 230.

[50] State Pretrial Hearing, 10/28/1996, Tr. 63-64.

[51] Federal Trial, 12/14/99, Tr. 230.

Estrella became "nervous and scared" and claimed not to recognize Cain.[52] Amaury Rosario and Sean Estrella's confessions largely coincided, so corroborated each other, even if both minimized their roles.[53]

Using the information from Rosario and Estrella, the police took photo spreads to surviving witness Eric Caraballo, and he identified Cain as the Uzi-carrying robber.  Mr. Caraballo recognized a photo of Posada's photo but could not be sure.[54]  Cain and Posada were both arrested.  Both men asserted their rights to remain silent and requested lawyers.  With no statement from Posada and an uncertain surviving victim identification as to him, police released Posada.[55]  Had it not been for Mr. Rosario's December 1995 confession, police would have been left with no other suspects and Almein Cain and Sean Estrella would have remained at large.  Cain was a violent and clearly psychotic individual, and Mr. Rosario's confession brought him down.[56]

Page from Amaury Rosario Written Statement, 12/17/95, Exhibit I.

---

[52] State Pretrial Hearing, 10/30/1996, Tr. 299-301.  In Almein Cain's State Trial 9/17/97, Tr. 170-71, Sean Estrella was asked if he was afraid of Cain, to which he responded "of course I was."

[53] In court papers the Government characterized the video and audio statements as "consistent with Estrella's and Caraballo's testimony and provided more details, except that Rosario stated that he stayed near the front of the store during the robbery and that Cain was in the back of the store with the employees when the shooting occurred." 04 CV 00688, ECF. Doc. 17, filed 08/17/05 at 10.

[54]  Federal Trial, 12/14/99, at 330.

[55]  State Trial Amaury Rosario, 2/25/98, at 575-77 (Julio Posada did not give a statement and was released). The original Federal PSR for Mr. Rosario states that Posada was "prosecuted locally and convicted."  PSR, para. 18. If that is the case, it was on different charges of which we are unaware.

[56]  The importance to the investigation of Amaury Rosario's confession cannot be overstated. In later court filings, Federal prosecutors described how it was only after Rosario's December 17, 1995 statements that Detectives identified the other perpetrators:

By December 17, 1995, Rosario was the only robbery participant whom the police had been able to identify (through a photographic identification by victim Eric Caraballo).  It was only after Rosario's statements on December 17th that Detectives began looking for Rosario's accomplices and effecting the arrests of Sean Estrella and Almein Cain.  In short, the police demonstrably lacked the information that Rosario claimed to have been fed.

19

**4.** *Miller* **Factors:** Susceptibility to Familial and Peer Influence/Failure to Appreciate Risks During Judicial Proceedings/Potential for and Demonstrated Rehabilitation

One of the factors that must be considered as a possible aggravating factor here is Mr. Rosario's false claim that he statement was coerced and his false alibi defense. Yet, Estrella's testimony alone shows how the teenage boys were intimidated by Cain, even after the crime. Housed together at Rikers Island and transported together for court appearances Cain got the teenage boys to recant their confessions. [57] Cain threatened that "[i]f you don't, if you do testify and you don't sign this then, things could happen to you, I'll get you and your family, whoever it is, I'll get you."  Both teenaged boys filed motions claiming the statements were physically coerced by police.[58]  Estrella even explained how the details of setting up their defense was almost part of the culture at Riker's Island:[59]

> *Q: [Y]ou believed that if you could show that it was coerced it would help you?*
> *A: Yes.*
> *Q: And where did that idea come from?*
> *A: I looked at other people's cases and people talking.*
> *Q: When you say talking?*
> *A: Throughout the prison system.*
> *Q: You're talking about Correction officers or—*
> *A: Inmates.[60]*

Cain, Estrella, and Rosario had a a joint suppression hearing in October, 1996.  Mr. Rosario and Estrella presented their police brutality claims, and lost.  Thereafter, Mr. Rosario's case was separated from Cain and Estrella's.  Cain and Estrella's joint trial was the first to go to jury selection.  After 9 jurors had been seated, Estrella agreed to testify against his co-defendants,[65] with a promise of a reduced sentence of 18-36 years in state prison.   The remaining defendant in the trial, Cain was convicted on November 24, 1997.   He was

---

[57] Estrella testified about a handwritten letter that Cain had asked Estrella to use to exculpate Cain; Federal Trial, 12/14/99, at 177, 202-03;  State Trial, Amaury Rosario, 2/10/98, a t208-09,  218.

[58]  State Joint Suppression Hearing Transcripts indicate the hearing took place in October, 1996. Sean, like Amaury, renounced his December 1995 confession, claiming it was the result of police abuse. Federal Trial, 12/14/99, at 171.

[59]  Evidence also showed that Mr. Rosario's girlfriend and her mother were also serving as go-betweens for Cain with the teenaged boys at Riker's Island.  Federal Trial, 12/21/99, at 584 (Government summation listing evidence showing that Amaury Rosario's girlfirend visited Cain 5 times at Rikers Island and that Cain and Estrella were constantly calling the house where Zulma, Posada's girlfriend, and Zulma's daughter, Jessica, were living).

[60]  State Trial, Amaury Rosario, 2/10/98, at 208.

[65]  State Trial, Amaury Rosario, 2/9/98, at 98.

sentenced to 130 years in New York State prison.[66]  He remains in state prison in Attica, New York.[67]

Mr. Rosario's state trial ended in an acquittal on March 8, 1998.   He was released. Immediately, he left New York.  He, his girlfriend and their daughter (Melany, who was 2 at the time) moved to Georgia where the girlfriend has a cousin.  He worked at the Atlanta Airport – a job he describes with great fondness.  It was his first time out of New York (other than to go to the D.R.) and he remembers marveling at how safe it was.  He wrote about that time:  "It felt like there was no crime.  Everybody was friendly.  There weren't separations, you know? Like there was this guy I worked with and I helped him build a little patio on his house with a nice ramp for his moms. Georgia was the first time I was really mixing it up with people from different races.  They didn't know what to make of me.  I never felt any prejudice or anything like that. My friend's mom used say stuff like 'look at that nice Mulatto boy' and I remember laughing and saying, 'no maam I'm Latino,' and she would be like 'what part of Mexico is that?'  And we would all bust up laughing."

Regarding the months between the state and Federal proceedings, Dr. Bardey observed:

*Interestingly, when he took himself out of the environment after his initial acquittal, Mr. Rosario left this lifestyle behind him. It was not part of his nature, so it did not follow him. It was only when he was remanded into custody and convicted, that he once again manifested, albeit to a lesser degree, similar criminogenic behaviors. Still a young man, being plunged back into a hostile environment, invited a return to prior behaviors. This further supports the contention that it was the environment that impacted on Mr. Rosario's behavior as an adolescent and young adult, rather than any antisocial character traits in Mr. Rosario.*

Exhibit C (Bardey Report, at 25.)

The defendant was arrested on the Federal charges on August 4, 1998.  Transported back to New York, he was held at Rikers Island because of the juvenile transfer proceedings.  He had to be held in Rikers Island until the juvenile transfer, approximately June, 1999.  Exhibit B (Carr Report, at 18).  He was then transferred to the Metropolitan Correctional Center (MCC) in Manhattan and later to the Metropolitan Detention Center in Brooklyn (MDC).

---

[66] Almein Cain v. Herbert, 02 CV 3956, Pacer Document 10 (People's Affidavit in Support of Motion to Dismiss Habeas Corpus Petition, at 4.).

[67] DOC Inmate Locater..

Your Honor was there for the rest of the chronology.  The opening in the Federal trial took place on December 13, 1999.  Anthony L. Ricco, Esq. was appointed as counsel for Mr. Rosario. But even Mr. Ricco could not overcome the strong evidence and the jury convicted.

We recognize that the nature of the trial strategy in the Federal case is a potentially aggravating factor.  However, one this point, it becomes clear that, like so many other areas in Mr. Rosario's young life, the choices about trial strategy were being made by others.  Mr. Ricco's sentencing remarks are most illuminating:

> But there is one aspect of the case that is not a part of the record that I think is very important, and that is that the defendant's family in the case -- his parents are here today, Mr. and Mr. Rosario are here, they are here with their pastor. They are seated in the first row.  Unfortunately, because they were potential witnesses, they were not able to sit in the courtroom during the trial as appropriately they should not have been.  As a result of that, they didn't really have an opportunity to see and hear the evidence: to really get a sense of what happened in the courtroom.  I think it would have been excellent for [Amaury Rosario's parents] to have had that opportunity.  Regardless of what the court does in terms of sentencing, his family is still left with the responsibility  of dealing with his moral growth. Had they had an opportunity to be in the courtroom to see the trial unfold, to see the witnesses, to see the exhibits, to see and hear the testimony of their son, I think their role in the continuing process of relating to him would have been so much more meaningful.  I know that this not something that normally comes up at sentencing, but I am burdened to a certain extent with the responsibility of representing a very young defendant before this court and all of the dynamics that go along with that representation.  It  has been my observation, given their participation, both before the trial and during the trial and since the trial, that it would have been wonderful for them to have had the opportunity to see the evidence in the case and hear the witnesses.  It would have given me a much stronger feeling about the kind of direction that Amaury would go in after today.[68]

Mr. Ricco insightfully recognized that even at 20, Mr. Rosario "wasn't [his] own man yet."  Exhibit A (Defendant's Letter to Court, at 7).  "At sentencing I wanted to be more forthright but it was unrealistic at that time.  I tried to say I felt about the victims. . . . but I didn't want to lose my parents and my support system with a life sentence."  *Id.*  Without even being there, the emotion and remorse jumps off the page in Mr. Rosario's 2001 remarks at sentencing – – even as he maintained the false claim of innocence.  (For comparison's sake, it is useful to contrast the sentencing minutes of Mr. Almein Cain from 1999, also attached at Exhibit J).  It can now be so clearly seen how the trial strategy was driven, and perhaps understandably so, by parents who refused to believe their child capable of murder.  It was his parents who hired the state lawyer who won the acquittal, and his parents whose claim of a party for the grandparents became the alibi defense, despite the obvious contradiction of Customs documents introduced at trial.  Was this pressure worse than the pressure Mr. Rosario had been under to renounce his confession from his violent co-defendant in the state case?  It was a different pressure, to be sure,

---

[68]   Exhibit J (Sentencing Transcript, June 26, 2001.)

but either way these were extraordinary pressures for a young man fighting for his life.  Thus, the false defense cannot be seen as indicating psychosis or dangerousness.  Exhibit C, (Bardey Report, at 24).  To his credit,  Mr. Rosario has grown up and has demonstrated measurable ability to handle himself under pressure.  He recognizes that he cannot blame his family for anything and  "he has to own up for his actions."  Exhibit B (Bardey Report, at 20).

*My moms still believes I'm innocent.  She thinks I am being influenced to take guilt to accept it.  She will never accept it.  Even back in the day she was more than my father saying I had to go to trial no questions.  You already know that the woman runs the household for real and that was that.  I have had my arguments with her about me admitting my guilt and me participating in the Challenge Program and restorative justice.  I had to sit her down on a visit at least 10 years ago and tell her I have to make my own decisions.  I can listen to family but its on me.*

Exhibit A (Defendant's Letter, at 7).

Looking at Mr. Rosario prison record it is easy to see the arc of rehabilitation.  Despite having served time in some of the worst most violent prisons in the country, his disciplinary record is described by prison officials as "minor."  Exhibit G (Memo of Corrections Officer interviews).  He has only one "fight" on his record, and even that is relatively minor.  No weapons were involved and it was reduced to "assault without injury."  He had makeshift weapons for protection early on in his incarceration – a matter survival at a high security prison.  As noted by one of the Corrections Officers who agreed to be interviewed for this resentencing, "If you aren't scared to be [in a high security facility,] something is wrong with you.  *Id.*

 Mr. Rosario's rehabilitation accelerated in 2008 when he applied for a BOP program called the Challenge Program.  As a lifer Mr. Rosario would get no "time off" for particpation, however exemplary.  It was intensive and demanding.  With no incentives except self-improvement, he enlisted.  While on the Challenge Program waiting list, he was told he needed to keep a "clean" record for several years.  He started impressing people.  First other inmates started noticing.  He wasn't interested in unauthorized smoking or the Tylenol 3 they were sold.  No, he didn't want to join a gang.  He became proactive, seeking out prison programming to further his education.  Guards started noticing his conduct They "observed [him] over a several year period between approximately 2008 and 2013," during which he made "substantial rehabilitative progress and it was partly this progress that got him into Challenge." *Id.*

He took a paralegal class where he scored 100% on the examination.  He landed the "cream of the crop" prison job – in the Prison Commissary.  *Id.*  On the job he impressed his supervising officers, who described him as a "gentleman," and were even surprised when they learned of his charges.  The willingness of four Corrections Officers from a maximum security prison to come forward for him is, as far as I can recall, unprecedented.  Particularly when it is considered how beset with violence against inmates and guards USP Canaan has been, that they

23

would go to this extent for Mr. Rosario speaks volumes. *See* Exhibit G (describing Canaan's violent recent history).

Once in the Challenge Program, Mr. Rosario excelled. He was ready for that structure and he threw himself into it. Once provided the tools – some 13 years into his imprisonment – Mr. Rosario has filled notebooks with insightful self-reflection. Exhibit B (Carr Report, at 21). Challenge Staff began giving him speaking roles because they could count on him "to model well for others." Exhibit G. He threw himself into writing, reading, ordering books with the money he made from his Commissary job. He became a prolific writer and scheduled himself during his free times in order to avoid negative situations.

The memo of interview of the Prison Psychologist and Treatment Specialist is attached (Exhibit G), as well as the underlying report of his progress while still in Challenge. These indicate that he "far exceeded his peers" in his performance in the program. Once again, the support of these officers, and the Prison Psychologist who directs the program, is unprecedented. They are saying to this Court everything short of what they know they legally cannot say – that Mr. Rosario no longer presents a threat to society. That is, of course, a decision for the Court, and they respectfully do not tread on it. But the tone and the willingness to speak so enthusiastically about the state of Mr. Rosario's rehabilitation may well be the most poignant call for ending his sentence.

Rehabilitation like this simply cannot be feigned absent some deviant psychosis of which there is no evidence here. As far as risk factors for future dangerousness, in addition to the detailed experience of his 22 year prison record the Court has, it is no exaggeration to say that since 1995 Mr. Rosario has had dozens of psychological evaluations. He had the three in connection with the juvenile transfer.[69] He had one every time he went to or came out of solitary confinement (which was a common punishment for even the minor infractions on his BOP record). He had another psychological examination on November 4, 2008, in the Challenge Program application. At each turn he was considered to have no mental issues and "his

---

[69] The findings of juvenile transfer evaluators, all attached with Exhibit D, found:
- Dr. Rosenfeld – defendant did not meet the criteria for antisocial personality disorder
- Dr. Berrill – defendant did not meet the criteria for antisocial personality disorder.
- Dr. Landsmark – examined psychological tests, reporting her results as "markedly similar" to Dr. Berrill's results. She also saw "evidence of dysfunctional family patterns [and] a suspected history of emotional abuse/neglect."

psychological stability was judge to be favorable." Exhibit G (Challenge psychosocial conducted 1/8/14). He was an open book for the evaluation by Dr. Bardey (Exhibit C), who reviewed the records and concluded that "there is no reason to believe that at this point, incapcitation of Mr. Rosario is necessary to protect society." Exhibit C, at 29.

Once again, the trial attorney Anthony Ricco offered prophetic remarks at the 2001 sentencing proceeding:

> *A life sentence for him essentially says his rehabilitative potential has been determined and there is none. I don't think ghat there is any evidence to establish....that he has no rehabilitative potential. My experience as a lawyer is that young men who survive in prison over long time periods mature, if they survive. They learn and they change. . I think that the horror of the death of the people who died here and the tremendous tragedy that fell upon their families for nothing that they've done other than working at jobs and trying to live their lives, is given meaning by giving this young man some hope to strive and to live for. That's my view, and I understand that there is a contrary view. The contrary view is pretty straightforward. It is a view that I respect. It is a view that the defendant respects, I believe.*

Exhibit J (Sentencing Transcript 6.26.10, at 10-12).

A few years after the sentencing, when Mr. Rosario's parents would once again hire a lawyer, this time to file the habeas petition this Court denied in 04 CV 688, Mr. Ricco would offer more insight in a declaration filed with this Court on April 10, 2005:

> *I am of the belief that the imposition of a life sentence on Amaury Rosario is devastating. The jury determined that Amaury Rosario was partially responsible for a terrible crime. These are crimes, however, which resulted from the misguided judgment of a seventeen year old boy. It is a decision that will cost him his freedom from the remainder of his natural life. This punishment is imposed upon Amaury Rosario while another, Sean Estrella, who was far more sophisticated and more culpable than Amaury Rosario, smartly availed himself of a favorable plea agreement which will permit him to be restored to freedom in a few years. Amaury Rosario is left to litigate and create ways to regain his freedom. I was and remain very devoted to representing Amaury Rosario.*

Exhibit J (Declaration of Anthony L. Ricco, Esq., at 13).

Since his transfer to the MDC, Mr. Rosario no longer has the prestigious high-paying job at Commissary, but he is not complaining. It is safer than Canaan and the proximity to his family allowed him to make some peace with his father before his death and to work on his relationship with his daughters. He works in the kitchen and as an orderly, cleaning and

25

mopping floors on his unit. The programming opportunities at MDC are limited, but it seems based on the 37 certificates he has accumulated that he has availed himself of just about every one.  Exhibit K  (BOP records).

Mr. Rosario is no longer the follower as he was in his youth.  In the most improbable of outcomes, he has become a leader for social change within the confines of the prison.  Just as he did at USP Canaan he continues to redefine the "tough" prison image.  He continues to be "an unusually brave inmate [who] challenges the negative norms of himself and his peers."  Exhibit G (correction officer interview).  A former inmate writes  that "more than any inmate I met, Amaury Rosario turned around my perspective. . . . Amaury may look like he a hard guy but he isn't.  You realize when he cracks a joke or starting hitting you up with all that philosophy." Exhibit L (inmate letters).  "I was young and fresh out of the gang life and [Amaury] broke it down to me. . . He said 'If you so smart [], why don't you get out?  I became a gang dropout." *Id.*

Inspired by the Challenge Program, Mr. Rosario began sharing materials with other inmates and even his family members.  He continued studying them and just finding no programming like Challenge he developed his own, an Inmate-Led Program called "Running Free."  It is a twice weekly class for inmates for decidedly non-threatening activities like yoga and meditation.  Mr. Rosario prepares the curriculum and, inspired in a positive way by his graffiti art days, his original artwork advertises it (Exhibit L).  Several inmates have written to the Court (Exhibit L), describing their happy experiences in his Running Free class of "fitness training and life lessons" at the MDC.  "Amour taugh us a lot of stuff he learned in the challenge program.  It sound like a cool program that I hope I can join." *Id.*



**Exhibit L (program created by Amaury Rosario.**

Even at MDC, where guards are usually more guarded with their opinions about inmates than at USP Canaan, he draws positive attention. Recently, a paralegal told me that during a visit with Mr. Rosario at the MDC the corrections officers who escorted her from the visiting room remarked that Mr. Rosario was a "great" inmate and that he gives her no problems.[70]

---

[70]  The paralegal gave me the last name of complimentary Corrections Officer and I called the MDC to speak to her.  She was was nervous to speak to me and said that I had to clear it through the Legal Department, which I tried to do and was told the MDC does not allow guards to speak to attorneys about inmates.

I later emailed Mr. Rosario to share the officer's compliment.  He wrote back, as he occasionally does, with a poem:

> **GHETTO MR. MIYAGI**
> *The CO followed my legal out of visiting today*
> *to say how great I was, that I don't give her any problems*
> *and she would vouch for me at sentencing.*
> *That is really cool right there.*
> *I didn't see that coming.*
> *Maybe because today I was mediating*
> *and actually levitated off the ground*
> *with my chi and then I hit the ceiling*
> *and busted my a\*\* on the way down*
> *like a ghetto Mr. Miyagi[71] with a doo rag on.*
> *Ok let me stop.*

Mr. Rosario has written a book of poems entitled "My Hope is Loud."  They are generally of a more serious and reflective tone than *Ghetto Mr. Miyagi,* but the Miyagi poem captures both his humorous side (reported by so many in the Carr Report), his self-deprecation, and his pride that someone recognized his fundamental decency.  His rehabilitative work has been so extraordinary that he has been offered one of 20 fellowships for people affected by the criminal justice system.  The program is an 8-month community leadership development program called the Beyond the Bars Fellowship, and is offered through Columbia University's Center for Justice.  Exhibit O (Letter of Program Director, Center for Justice at Columbia University).  The director writes:

> *Mr. Rosario is exactly the type of candidate we look for in the Fellowship, someone who has experienced the criminal justice system and through that experience has emerged as a leader and someone who is committed to changing themselves, their community and society at large.*

Exhibit O (Letter of Program Director, Center for Justice at Columbia University).

## B.  18 U.S.C 3553(A) AND *MILLER* SENTENCING FACTORS APPLIED

The overriding consideration here is always the admonition to impose a sentence "sufficient, but not greater than necessary" to satisfy the purposes of punishment.  The familiar purposes of punishment must be considered, i.e. the need to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of

---

[71]  Mr. Miyagi was the older mentor "Grasshopper" character in the 1985 film "The Karate Kid."

the defendant; and (D) to provide the defendant with needed educational, or vocational training, medical care, or other correctional treatment in the most effective manner.

Overriding all of these considerations is the need to address the differences between juveniles and adults:"

♦ the juvenile's chronological  age and with it his immaturity, impulsivity, failure to appreciate the risks and consequences of his action, and an underdeveloped sense of responsibility;
♦ vulnerability "to negative influence and outside pressures" which limit "control over their own environment," resulting in "lack of ability to extricate themselves from horrific, crime-producing settings";
♦ the role of familial and peer pressure; his inability to deal with the police, prosecutor and his own attorney;
♦ the possibility of rehabilitation and character and traits that militate against a finding of "irretrievable depravity."

*Miller*, 132 S.Ct. at 2464 (citing and quoting *Graham v. Florida*, 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010); *Roper v. Simmons*, 543 U.S. 551, 569–70, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)).

Following traditional guidelines analysis, the circumstances of the shooting in this case could easily be described as duress not amounting to a complete defense within the meaning of USSG 5K2.12.  Clearly Mr. Rosario cannot be excused from the crime–he agreed to participate in an armed robbery.  But the facts remain.  He tried to sabotage in a measurable, provable way, by leaving the gun he had been provided behind and leaving the store.

It might suggested that the number of victims in the *Compadre* robbery sets it apart from these other cases.  *But cf. United States v. Sheppard*, , 2017 WL 875484 (W.D. Missouri 2017) (life sentence reduced to 20 year term for defendant convicted of arson that resulted in deaths of six firefighters). In his psychological evaluation, Dr. Bardey observed that the number victims seemed more an "indication of the efficiency and power of the weapon itself rather than premeditation or sadism on the part of this 17-year-old defendant."  Exhibit C  (Bardey Report, at 26).  It is hard to deny the impact of the "juvenile brain combined with he neurological realities of adrenaline and cortisol in what must be acknowledged as a warlike moment."  *Id.* The crime scene photographs and testimony at the trial, which the Court will recall, depicted the shooting in a narrow corridor where victims were piled against a freezer door.  While it is awful to think about the positioning of the victims – it was done by the other perpetrator.  This was far from a carefully planned sniper attack.  In one second and one press of the trigger the submachine gun used in the crime would have sprayed 20 rounds.[72]

---

[72]   Exhibit F (Ballistics Forensics Report), at 4.

The various attachments also set forth certain aspects of the defendant's social history, including an unusually abusive and isolated childhood.  These are deserving of some consideration as well, as they undoubtedly informed the defendant's mindset, particularly those issues that led to Mr. Rosario's conflicts with his father.  Exhibit C  (Bardey Report, at 3-6); Exhibit B (Carr Report, at 4-9).  It should also be conceded here that, while his presence at the robbery in the first place was no accident, Mr. Rosario, unlike an adult, had limited "control over [his] own environment" such that it could be concluded that when handed the Uzi by Cain he "lack[ed] the ability to extricate [himself] from horrific, crime-producing settings." *Miller*, at 2464.  A court can find mitigation where a defendant "did not intentionally act with malice aforethought" in committing the murder. *United States v. Sheppard*, 2017 WL 875484 (W.D. Missouri 2017). It is "[b]y protecting even those convicted of heinous crimes, [that] the Eighth Amendment reaffirms the duty of the Government to respect the dignity of all persons." *Roper v. Simmons*, 543 U.S. 551 (2005).

## II. CONCLUSION

When he was a teenager, Amaury Rosario confessed his involvement in the *Compadre* robbery, and in doing so recounted for posterity those last conversations with Plinio Acosta (Tricky) and Ramon Rodriguez. For those men, and for Marvin Caraballo, Giuseppe Meluzio and Eric Caraballo, Mr. Rosario can only offer his story of caution, hope, and redemption.

*I don't think I will ever reach the point that I have made up for my past. That is something I think is literally unachievable. Lives were taken. It leaves a hole to big to be filled with anything language can heal. . . . Whether in prison or out I intend to regain my footing in society and put my energy into helping reform anyone that will listen. . . .Whatever the outcome I am really glad to have had the chance to make amends and clear the record maybe this will help some of the familys. Anything that will help get closure I will do it. I will work to stop this pain from reaching others. I will never stop working on myself.* Exhibit A (Defendant's letter, at 9-10).

Thank You for Your consideration of his case.

Respectfully Submitted,

*Jan Rostal*

JAN A. ROSTAL, ESQ.
(718) 330-1207
Jan_Rostal@fd.org

cc: AUSA Douglas Pravda, Esq.  (by ECF)
      US Probation Officer

29