UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| UNITED STATES, | |
|---|---|
| — against — | **99-CR-533 (ARR)** |
| | **12-CV-3432 (ARR)** |
| AMAURY ROSARIO, | |
| | **Statement of Reasons** |
| Defendant. | |

ROSS, District Judge

Amaury Rosario is before me for resentencing pursuant to the Supreme Court's decisions in *Miller v. Alabama*[1] and *Montgomery v. Louisiana*.[2] In *Miller*, the Court held that juveniles who commit homicides cannot be sentenced to *mandatory* terms of life imprisonment. Instead, only "the rare juvenile offender whose crime reflects irreparable corruption" can be lawfully sentenced to a lifetime in prison without the chance of parole.[3] Then, in *Montgomery*, the Court held that *Miller* applied retroactively to those juvenile offenders who had been sentenced to mandatory terms of imprisonment, but whose convictions had already become final before *Miller*, like the defendant here.

*Miller* and *Montgomery* are but the latest in a series that began with *Roper v. Simmons*,[4] which outlawed the death penalty for juveniles who commit crimes, and *Graham v. Florida*,[5] which outlawed life imprisonment without parole for juvenile offenders who commit crimes other than homicide. Collectively, these cases stand for the proposition that adolescents are different from adults—and must be treated differently by courts.

This line of cases is based not only on society's "evolving standard of decency," but also on our increasing understanding of adolescent brain development. The

---

[1] 567 U.S. 460 (2012).
[2] 136 S. Ct. 718 (2016).
[3] *Montgomery*, 136 S. Ct. at 734; *see also Miller*, 567 U.S. at 479–80.
[4] 543 U.S. 551 (2005).
[5] 560 U.S. 48 (2010).

Supreme Court has delineated three areas of fundamental difference between juveniles and adults. First, juveniles are more prone to take risks and less attuned to the potential consequences of their actions.[6] Second, juveniles are more "susceptible to negative influences and outside pressures, including peer pressure."[7] And, third, the character of juveniles is not as well formed as that of adults; indeed, the vast majority of adolescent offenders eventually age out of criminality.[8] These conclusions are rooted not only in common sense, but also in neuroscience and social science.[9] And, according to the *Miller* court, with the passage of time and further studies, the evidence for these conclusions has "become even stronger."[10]

As explained by Dr. Laurence Steinberg, a professor of psychology at Temple University and an expert in adolescent cognitive development, recent research has established that the areas of the human brain dealing with "judgment and decision-making" continue to mature well into our 20s.[11] Thus, due to "neurobiological immaturity," even older adolescents "continue to demonstrate difficulties in exercising self-restraint, controlling impulses, considering future consequences, and making decisions independently from their peers."[12] For example, under calm conditions, "individuals between 18 and 21 were able to control their impulses as well as those in their mid-twenties. But under emotionally arousing conditions, 18- to 21-year-olds demonstrated levels of impulsive behavior comparable to those in their mid-teens."[13]

---

[6] *Miller*, 567 U.S. at 472; *Graham*, 560 U.S. at 68; Roper, 543 U.S. at 569.
[7] *Roper*, 543 U.S. at 569; *accord Miller*, 567 U.S. at 472; *Graham*, 560 U.S. at 68.
[8] *Miller*, 567 U.S. at 472; *Graham*, 560 U.S. at 68; Roper, 543 U.S. at 570.
[9] *Miller*, 567 U.S. at 471.
[10] *Id.* at 472 n.5.
[11] Decl. of Laurence Steinberg ¶ 12, Ex. E to Defense Sentencing Mem., ECF No. 76–7 ("Steinberg Decl.").
[12] *Id.* ¶ 25.
[13] *Id.* ¶ 23.

These findings, taken together, are of significance in assessing all four of the classic penological justifications of punishment. As *Miller* states, retribution, deterrence, incapacitation, and rehabilitation typically will not justify the harshest sentences for juveniles who commit crimes, even for those who commit truly heinous crimes.[14] In the words of the *Miller* court, quoting *Graham*: because "'[t]he heart of the retribution rationale' relates to an offender's blameworthiness, 'the case for retribution is not as strong with a minor as with an adult.' Nor can deterrence do the work in this context, because 'the same characteristics that render juveniles less culpable than adults'—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment."[15] Similarly, "[d]eciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'—but 'incorrigibility is inconsistent with youth.'"[16] And, finally, rehabilitation cannot justify a sentence of life imprisonment because a life sentence "'forswears altogether the rehabilitative ideal.' It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change."[17]

With those considerations in mind, I now turn to the statutory factors I must consider when imposing a sentence.[18] As an initial matter, it is undisputed that Rosario's guidelines sentence remains life imprisonment.

### The nature and circumstances of the offense

Turning to the nature and circumstances of the offense, this was undoubtedly a heinous crime. Indeed, it is one of the most heinous crimes I have encountered in almost 25 years as a district court judge. Rosario, along with his co-defendants, shot and killed four unarmed people. A fifth victim, Eric Caraballo, survived only because the robbers

---

[14] *Miller*, 567 U.S. at 472.
[15] *Id.* (first quoting *Graham*, 560 U.S. at 71, then quoting *Graham*, 560 U.S. at 72).
[16] *Id.* at 472–73 (second and third alterations in original) (quoting *Graham*, 560 U.S. at 72–73)
[17] *Id.* at 473 (alteration in original) (quoting *Graham*, 560 U.S. at 74).
[18] *See* 18 U.S.C. § 3553(a)(1).

ran out of bullets. This crime ripped a hole in the victims' families that, over 20 years later, remains almost unbearably raw. I was deeply moved by the words of Mr. Caraballo and the other victims's family members, both written and in court today. I cannot begin to comprehend their pain and suffering.

There are several aspects of his role in this offense, however, that somewhat mitigate Rosario's culpability, particularly in light of his youth—he was 17 years old at the time of the offense.

This crime was planned by Almein Cain and Julio Posada, men in their twenties, seven to ten years older than Rosario, both of whom had prior armed robbery convictions. Cain and Posada recruited two teenagers, Rosario and his co-defendant Sean Estrella, to help them rob the Compadre grocery store. Rosario's participation in the crime no doubt had particular value to them because he was familiar with this bodega—and the people who worked there, who in turn were familiar with him.

Cain brought three guns to this robbery: an Uzi, a revolver and a Tec9. Rosario's role in this crime was supposed to have been limited—he was told to hide in the basement of the bodega until after closing time, subdue anyone who remained, and let the other robbers in. As instructed, he descended to the basement to hide. He then stashed the Tec9 that Cain had given him in the space between the top of a wall and the basement ceiling, underneath some cardboard. Before closing time, however, Eric Caraballo, whom Rosario knew, discovered Rosario in the basement and told him to leave. Instead of grabbing his gun, Rosario accompanied Caraballo upstairs, left the bodega, and returned to the nearby van where his confederates were waiting. Rosario explained to Cain that there were too many people in the store to proceed with the robbery. When Rosario told Cain that he had left his gun behind, Cain became upset and ordered Rosario to return to the bodega.

When Rosario returned as directed, the other robbers rushed into the store behind him. Cain, who was wielding the Uzi, announced the holdup. Posada held the

4

revolver. Neither Rosario nor Estrella was armed. Rosario was the only one of the robbers who was not wearing a face mask. Cain and Posada herded the robbery victims to the back of the store, and forced them to lie down. Rosario approached Cain to express his apprehension that the victims could identify him, having seen his face. Cain cocked the Uzi, handed it to Rosario, and told him to "do what he had to do." They then walked to the back of the store, where Rosario and Posada shot and killed four men, wounding a fifth—Eric Caraballo. At both his state and federal trials, Rosario denied responsibility for this crime, advancing a false alibi defense.

Nonetheless, Rosario has since taken responsibility for his actions. He admitted his involvement in this crime to his parents a decade ago, and forthrightly accepted responsibility as part of his enrollment in the Bureau of Prison's Challenge Program, which I will discuss further later. He wrote in a recent letter to the court that, although he believed his choice was to "either shoot or be shot" when Cain put the Uzi in his hand, in the end he was the one who pulled the trigger. Rosario expressed what I believe to be heartfelt remorse for his actions, and acknowledged the pain and suffering that he has caused. Moreover, contrary to the government's contentions, I do not find his perjury during the prior proceedings to be of great import, especially when viewed in light of his relative youth and when compared to the severity of this crime.

I credit that Rosario intended to participate in a robbery, but found himself involved in a far more violent crime. Indeed, the fact that he hid the Tec9 so well that it was not found in the basement for over a year suggests that he did not intend to use it. Nevertheless, I am not persuaded by defense counsel's argument that Rosario was attempting to sabotage this robbery, or that he is eligible for a downward departure based on coercion and duress. Nor am I persuaded by the government's claim that Rosario had an opportunity to withdraw completely from this crime after he first left the bodega. When Rosario appeared at the van, he was ordered to return to the store by Cain, a significantly larger, older man, armed with an Uzi. Later, Cain directed Rosario

5

to shoot. After returning to the bodega, Rosario was not even in possession of a gun until Cain thrust one into his hands. While this does not absolve Rosario of responsibility for pulling the trigger, it does show that he was a follower, not a leader in this crime.

An examination of the facts and circumstances of this crime helps bring into focus how Rosario's youth was a mitigating factor. Although an adult is presumed to foresee that an armed robbery might end in bloodshed, an adolescent might well not. Indeed, as Dr. Steinberg explained, "adolescents are more likely than adults to underestimate the number, seriousness, and likelihood of risks involved in a given situation."[19] Adolescents are also "more apt to focus on the potential rewards of a given decision than on the potential costs."[20] "In general, adolescents are more short-sighted and less planful, and they have more difficulty . . . in foreseeing the potential outcomes of their actions."[21] Thus, when assessing his blameworthiness, it is necessary to keep in mind that Rosario ultimately participated in a different and dramatically more serious offense than the crime in which he initially agreed to participate. Further, the rapidly unfolding events were the kind of emotionally charged stressors likely to prompt even an older adolescent to act with childish impulsivity.[22]

None of this, of course, in any way diminishes the heinousness of Rosario's crime, or its impact on the victims and their families. But it does diminish his *culpability*. It also suggests that his crime, while unforgivable, may reflect circumstances far more than character.

---

[19] Steinberg Decl. ¶ 14.
[20] *Id.* ¶ 15.
[21] *Id.* ¶ 16.
[22] *See id.* ¶ 23.

6

### The history and characteristics of the defendant

Turning next to the history and characteristics of the defendant, the circumstances of Rosario's arrest and confession in this case are, I believe, of some significance. Less than a month after the crime and before any other perpetrators had been identified by the police, Rosario accompanied his girlfriend to the 110th Precinct—the same precinct investigating the murders—on a wholly unrelated matter. While there, Rosario was recognized by an officer as the robber who had been described by the surviving victim, Eric Caraballo. The officer asked Rosario to remain at the police station for questioning. Rosario acceded, waived his *Miranda* rights, and agreed to give a statement. Although he initially denied participating in the robbery and killings, within less than half an hour he tearfully admitted to his participation in the crimes, explaining that he had hesitated to confess because one of the victims was a relative, and he feared how his parents would react. Subsequently, he identified Cain as a participant and provided information leading to the arrest of Cain, Estrella, and Posada. These circumstances, too, in no way absolve the defendant from responsibility for the brutal killings. But they do reinforce the impression that Rosario was laboring under psychological constraints characteristic of a juvenile.

Turning briefly to factors relating to Rosario's upbringing, his parents, who undoubtedly loved their son, were nonetheless abusive in certain respects, further detailed in the record. By his teenage years, Rosario became unruly and risk taking, as evidenced by various matters developed in the record. His cousin recruited him into the La Familia gang.[23] And he acquired a juvenile record, largely involving small-scale robberies, resulting in incarceration at the Spofford juvenile detention center.

In 1998, after Rosario was acquitted of this crime in state court, he moved to Georgia with his common-law wife and his daughter.[24] There, he found a job at the

---
[23] Letter from Melanie Carr, Ex. B to Defense Sentencing Mem., ECF No. 76-4, at 5.
[24] *Id.* at 18.

Atlanta airport as a baggage handler and evidently did not engage in further criminal activities.[25] Within five months, however, he was again arrested, charged federally, and then convicted for the instant offense.

Although his prison disciplinary record was described by guards as "minor,"[26] Rosario's first few years in federal prison were checkered. He was twice found to have possessed a dangerous weapon and once assaulted another inmate, although without causing serious injury. He also incurred several other less serious disciplinary infractions. But starting in late 2004 or 2005, long before *Miller* raised the possibility that he might ever emerge from prison, he began to improve his behavior. His most serious disciplinary violation in the past 13 years was for possessing Tylenol 3, which he began using to treat a work injury.

Multiple prison staffers have attested to positive aspects of Rosario's character. In the words of one correctional officer, "He was a gentleman. Respectful to guards, inmates, everyone."[27] A prison psychologist noted that he was an "unusually brave inmate in that he was willing to challenge the negative norms of his peers and himself."[28]

Although, as a lifer, Rosario was ineligible to receive time off his sentence for his participation, he enrolled in the Bureau of Prison's Challenge program. This intensive residential treatment program aims to address and reduce criminal behavior, as well as address issues related to mental illness and substance abuse, via techniques taken from cognitive behavioral therapy. Staffers noted that Rosario "far exceeded his peers" in his engagement with the program.[29]

---

[25] *See id.*
[26] Memo. from Jan Rostal (May 25, 2017), Ex. G to Defense Sentencing Mem., ECF No. 76-9, at 2.
[27] *Id.* at 2.
[28] Memo. from Jan Rostal (May 15, 2017), Ex. G to Defense Sentencing Mem., ECF No. 76-9, at 2.
[29] *Id.* at 1.

Other inmates also attest to his positive influence. For example, Rosario convinced one fellow inmate to follow his lead and leave the gang with which he was affiliated. Rosario then interceded on that inmate's behalf with gang leaders and persuaded them to permit the inmate's disaffiliation.

Further, in preparation for this re-sentencing hearing, Rosario was evaluated by two mental-health experts, a forensic psychiatrist working for the defense and a forensic psychologist working for the government. Of particular significance to the issue before me, both experts found that Rosario had been rehabilitated and that he no longer poses a significant risk to the public.

In the words of the government's expert, Dr. Berill, "it is clear in speaking to Mr. Rosario . . . that he has grown and matured over the years and takes responsibility for his involvement in an extremely serious crime. [He] made no excuses for his behavior and reported that he continues to think about the instant offense on a regular basis. He reported that he has looked, particularly over the last ten years or so, for ways to improve his life and enhance his education."[30] Dr. Berill found that although Rosario may have some tendency to behave "in a verbally impetuous manner" and "might act in ways in that challenge authority . . . , *there is no indication that he demonstrates a pronounced penchant for aggression, sadism or violence*."[31] Dr. Berill concluded that, "ensuring that he is actively involved in treatment . . . , *few clinical concerns emerge regarding the likelihood that Mr. Rosario would become involved in the type of violent crime that resulted in his current incarceration.*"[32]

The defense expert, Dr. Bardey, opined that Rosario has achieved "complete rehabilitation."[33] Dr. Bardey found that, since his adolescence, Rosario has

---

[30] Report of N.G. Berill, Ph.D., Ex. A to Gov't Sentencing Letter, ECF No. 88, at 15–16.
[31] *Id.* at 14 (emphasis added).
[32] *Id.* at 17 (emphasis added).
[33] Bardey Report at 28.

9

"demonstrably changed his way of thinking [and] behaviors."[34] Indeed, despite facing a life sentence, he "pursued and accomplished a record of reform, rejected violence, demonstrated an inherent intellectual curiosity and willingness to learn positive, prosocial skills to take advantage of his talents and his desire to be a positive example to others."[35] Dr. Bardey concluded that Rosario no longer displays "antisocial personality traits," nor any other psychiatric condition.[36] And, by his conduct in prison, Rosario has "demonstrated [a] lack of dangerousness" and a "minimal risk of recidivism."[37] Thus, "there is no reason to believe that . . . [the] incapacitation of Mr. Rosario is necessary to protect society."[38]

**The purposes of punishment**

Keeping all this in mind, I turn to the four factors I am required by statute to consider—the need for the sentence imposed to provide just punishment for the offense, deterrence from criminal conduct, protection of the public, and rehabilitation of the defendant.[39]

The last three factors all militate in favor of Rosario's release. The undisputed evidence in the record supports the conclusion that Rosario has been rehabilitated. In the view of even the government's expert, he no longer poses a significant risk to public safety. Accordingly, there is no need for additional punishment to incapacitate him or deter him from committing future crimes. On the contrary, Rosario's record of rehabilitation "demonstrate[s] the truth" of what *Montgomery* calls "*Miller*'s central intuition—that children who commit even heinous crimes are capable of change."[40]

---

[34] *Id.* at 26.
[35] *Id.* at 28.
[36] *Id.* at 28.
[37] *Id.* at 29.
[38] *Id.*
[39] 18 U.S.C. § 3553(a)(2).
[40] *Montgomery*, 136 S. Ct. at 736.

10

It is also doubtful that additional punishment can be justified by the goal of general deterrence. As the Supreme Court noted in *Miller*, "'the same characteristics that render juveniles less culpable than adults'—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment."[41] Moreover, Rosario has already been incarcerated for longer than he had been alive at the time of this crime. The 25-year sentence of imprisonment sought by the defense is an undeniably long one, especially to an adolescent. It is therefore unclear why an even longer term of imprisonment would have any significant marginal effect in promoting general deterrence.

Indeed, the only justification for any significant additional imprisonment is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense,"[42] but, even here, Rosario's youth at the time of the offense somewhat mitigates the heinousness of his crime. Of course, that Rosario's brain was still developing does not diminish the devastating harm he caused. Nonetheless, as the *Miller* Court concluded, the hallmarks of his youth— immaturity, recklessness, and impetuosity—do make him less blameworthy.[43] A just punishment must take into consideration the severity of the offense committed. But it must also account for a juvenile offender's lessened culpability and greater capacity for change. Our society's evolving standard of decency does not deem it a just punishment to sentence juveniles to die in prison, no matter how heinous their crimes, absent a showing of "irreparable corruption."[44] And, here, the record indicates that rather than "permanent incorrigibility," Rosario's crime "reflect[s] the transient immaturity of youth."[45]

---

[41] *Miller*, 567 U.S. at 472 (quoting *Graham*, 560 U.S. at 72).
[42] 18 U.S.C. § 3553(a)(2)(A).
[43] *Miller*, 567 U.S. at 472.
[44] *Montgomery*, 136 S. Ct. at 726, 734; *see also Miller*, 567 U.S. at 479–80.
[45] *Montgomery*, 136 S. Ct. at 734.

**The need to avoid unwarranted sentencing disparities**

Finally, I wish to address the government's argument concerning "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[46]

Much of the parties' submissions have focused on the other *Miller* re-sentencings that have occurred in this district, as well as other districts in the Second Circuit. I have reviewed the records of the other *Miller* cases in the Eastern District of New York, but find them to be of limited assistance in determining an appropriate sentence here.

In one obvious respect, this is the most heinous of the *Miller* cases in this district. No other case involved as many deaths. To some extent, this may be a matter of happenstance, not a difference in the offender's intent. The other *Miller* cases in this district include instances where juvenile offenders shot at a group of four or more people, but only killed one or two individuals, perhaps because they were not armed with a submachine gun designed to fire as many as thirty bullets over two seconds. But that does not alter the reality that four people are dead at Rosario's hands and another was seriously wounded.

The government also suggests that Rosario is among the most culpable of the *Miller* defendants in this district because he was just a month shy of 18, while some of the other *Miller* defendants were younger. I do not find this argument convincing. Apart from the fact that some of the other defendants in these cases were also 17 years old, no magic transformation occurs when a juvenile reaches the age of 18. The research is clear that human brains are not fully developed until we are in our mid-20s. The difference between adolescent and adult brains is a qualitative one; the distinction between 16 and 17 is one of degree, not kind.

---

[46] 18 U.S.C. § 3553(a)(7).

In other respects, Rosario is the least culpable of the *Miller* defendants resentenced in this district.

Rosario is the only one who has submitted to a government evaluation to determine his dangerousness—an examination that showed that he does not presently show a penchant for sadism, violence, or aggression, and that he does not pose a significant risk to the public if he is released.

Rosario is also the only one of these individuals who desisted from criminal behavior after committing homicide. Two other *Miller* defendants, Kwok and Wang, used their killings to become leaders in their gang. A third, Raysor, who received a 28-year sentence after shooting at an entire family in a car and killing one of them, continued as a leader of a drug organization for another seven years before he was arrested. Another, Stone, continued with violent gang activities for three more years after shooting a rival drug dealer, including the commission of another attempted homicide and other violent crimes. A fifth, Wong, not only continued to participate in gang activities until his arrest; he also conspired with other gang members while he was on Rikers Island to kill a witness in his case. Rosario, on the other hand, moved to Georgia after being acquitted at his state trial, obtained employment as an airport baggage handler, and apparently sought to become a law-abiding citizen.

Finally, this is the only *Miller* case in this district that involved a robbery gone wrong. While several of the other *Miller* defendants were ordered to shoot their victims by older gang leaders, each of the other defendants can be said to have knowingly embarked on a mission to kill. Rosario, on the other hand, initially agreed to participate in an armed robbery, not to shoot anyone.

In sum, reference to these other cases, while instructive, does not answer the ultimate question before this court: what is an appropriate sentence in this case? At most, it provides me with a sense of the range of reasonable outcomes.

**Conclusion**

Before pronouncing sentence, I feel compelled to acknowledge yet again the eloquent and heartbreaking words of Eric Caraballo as well as his and the other victims' loved ones. This was a heinous crime that resulted in unimaginable loss. I have agonized over this case and have taken with the utmost seriousness the request that I re-impose a sentence of life imprisonment. But the harm that Amaury Rosario has inflicted, however great, is only one sentencing factor.

Ultimately, I am required to weigh a number of countervailing considerations. I must of course consider the four people Rosario killed and the one he wounded, as well as the trauma this heinous crime has caused—and continues to cause—the victim's families. But I must also consider Rosario's chronological youth and that the circumstances of this case reflect his extreme immaturity and his susceptibility to the malign influence of older co-defendants. And I must consider Rosario's record of rehabilitation in prison, as well as the evidence that he no longer poses a significant risk to society if released. Then, I must determine a sentence that gives due weight to each of these considerations.

Congress has commanded that I impose a sentence that is "sufficient, but not greater than necessary" to provide just punishment for the offense, afford deterrence from criminal conduct, protect the public, and rehabilitate the defendant.[47] Balancing all the pertinent sentencing factors, I conclude that a sentence of 28 years imprisonment is sufficient to serve these statutory goals without being unduly severe.

---

[47] 18 U.S.C. § 3553(a).